JONES, JUDGE:
This is a claim for damages for the alleged wrongful death of Edward P. House, the 37-year old son of Mr. and Mrs. Ronald E. House, residents of Hancock County. On July 1, 1972, the claimant’s son was committed to Weston State Hospital as an inebriate by the Mental Hygiene Commission of Hancock County upon the petition of his mother. On July 9, 1972, while a patient in Ward C, Unit 6, of said hospital, House was stabbed to death by another patient, Curtis Renforth. The assault took place in the bathroom and the victim was repeatedly stabbed with a kitchen knife which was sharpened and the handle wrapped with adhesive tape. There were no witnesses in the bathroom and the principals were first seen when House ran into the corridor pursued by Renforth with the bloody knife in his hand. House ran from one end of the ward to the door at the other end where he fell and died. Some of the 25 *59 to 30 patients housed in the ward were attending Chapel services in another part of the hospital at the time and one male nurse was on duty. This was a “closed” ward, the doors being kept locked and the patients not being free to come and go as they were in “open” wards. Inebriates were required by Court order to be kept in the hospital for a minimum of 30 days and that apparently accounts for the assignment of House to a “closed” ward.
The claimant contends that the respondent was negligent in failing to exercise ordinary and reasonable care to protect the decedent from Renforth, the respondent well knowing Renforth to be “homicidal”, “assaultive”, “unpredictable” and “dangerous”, with a penchant for knives. The claimant seeks damages under Code 55-7-6 in the amount of $10,000.00, an additional award of $100,000.00 for financial and pecuniary loss claimed to have been sustained by dependent distributees and the sum of $2,000.00 for funeral expenses.
A recital of Renforth’s record both as a criminal and a mental patient is necessary to a proper appraisal of this case. His first admission to Weston State Hospital was from the Moundsville Penitentiary on April 1, 1953. The record of his admission shows him to be “suicidal and homicidal”. He was returned to the penitentiary on May 15, 1953. Renforth was readmitted to Weston State Hospital in May, 1957 and discharged therefrom in June, 1957 because his sentence had terminated. He was readmitted in January, 1963 and discharged to “criminal authorities” in December, 1963. In June, 1967, he was readmitted and in October, 1967 was “returned to Court”.
On April 16, 1969, an order was entered in the Intermediate Court of Ohio County, West Virginia by which it was ordered that “the said defendant, Curtis O. Renforth, be confined to the Weston State Hospital in the Division for the Criminally Insane ***** until the further order of this Court”. On May 23, 1969, Dr. M. Aviles, Staff Physician, wrote a letter to Judge Thomas P. O’Brien, which letter also was signed by Dr. J. E. Lazaro, Acting Superintendent, with a copy to Dr. Bateman, Director of Mental Health, in which letter he pointed out that Renforth had a history of being very hostile, impulsive and showing homicidal tendencies and ended his letter with the following two paragraphs:
“Considering the above, it is the consensus of opinion of the *60 staff of this hospital that at the present time the patient is considered a threat to the security of the ward in which he is hos-pialized, and he has been known to threaten escape and strong evidence points out the possibility of a weapon in his possession at the present time.
Since the patient does not show any psychotic symptomato-logy, we strongly recommend his transfer back to the West Virginia Penitentiary at your earliest convenience.”
This letter was written while the hospital still had a separate security unit for the criminally insane. On June 9, 1970, Judge O’Brien ordered that Renforth be conveyed from Weston State Hospital to confinement at the West Virginia Penitentiary at Moundsville under the sentence theretofore imposed.
In the early part of the year 1970 the Maximum Security Unit for the Criminally Insane was discontinued at Weston State Hospital and thereafter all patients were intermingled unless the hospital authorities saw fit to place certain of them in seclusion. Despite the fact that there was no longer a separate unit for the criminally insane, Renforth was readmitted to the hospital on May 6, 1971. There is nothing in the record to show why Renforth was readmitted to the hospital after he had been transferred back to the penitentiary by the Intermediate Court of Ohio County at the urgent request of the hospital authorities and upon their insistence that he was “a threat to the security of the ward in which he is hospitalized”. The Court independently has examined the records of the Intermediate Court of Ohio County and the final order entered therein was that of June 9, 1970 ordering Renforth’s transfer to the penitentiary, so we may only conclude that the arrangement was made between the penitentiary and the hospital.
On September 20, 1971, Dr. A. J. DeLiz, Acting Superintendent of Weston State Hospital, wrote to the Department of Mental Health in Charleston with reference to Curtis Renforth in part as follows:
“During his stay in the hospital, he has been housed on Unit Six. The Unit Six team has examined this patient and on May 15, 1971, they recommended he be returned to Mounds-ville; however, he still remains in the hospital. It is the feeling of the Unit Team that the continued stay of this patient en *61 dangers the lives of the aides and other patients and also they cannot satisfactorily program all their plans because of his presence. The Unit Team submitted the following as evidence of the behavior of Mr. Renforth on the ward:
“ T. Put a blanket around a patient’s face and got his money,
2. Terrorizes other patients and because of it, the patients give him their money, cigarettes, and have homosexual relations with him,
3. Hit a patient on the head which resulted in a fracture,
4. Has been carrying threats to our aides,
5. Has been found receiving matches, razor blades, in his mail,
6. Has been found with a foot-long piece of metal in his room,
7. Found to be hiding a cache of razor blades, can opener, and matches in the bathroom.
We (Unit VI Team) feel that not enough is being done for the transfer of this patient. We have waited too long already.’
“It is quite evident that this patient offender cannot be helped in this hospital. It is also evident that this patient represents an imminent risk toward everyone concerned in this team.
“May we respectfully request again, that this patient be removed from this hospital.”
We fully realize that the charges against Renforth listed in Dr. DeLiz’s letter have not been proved and are not evidence in this case, but the letter clearly shows that the respondent knew or at least strongly believed that Renforth was extremely dangerous and unfit to be housed with non-offender mental patients. The record in this case is replete with reports of psychiatric examinations of Ren-forth, taken from the hospital files, which confirm the dangerous character of this man. It appears that sundry telephone calls were made as a result of Dr. DeLiz’s letter but nothing was done to solve the problem. Almost fourteen months were permitted to go by with *62 a letter and a few telephone calls as the sole effort to obtain the admittedly necessary removal of Renforth from a State institution which was no longer equipped to take care of him and at the same time protect others from his assaultive and homicidal tendencies. Renforth remained in the hospital, being treated as a mental patient, and not as a felon convicted of malicious wounding and under sentence to the penitentiary by the Intermediate Court of Ohio County.
The Court concludes that the State of West Virginia failed to fulfill its moral and legal obligations to protect the claimant’s decedent from a convict-patient well-known to the hospital authorities and officials of the Department of Mental Health to be a dangerous schizophrenia-paranoid with homicidal tendencies, that the respondent’s acts and omissions constitute negligence, and that such negligence was the proximate cause of the death of the claimant’s decedent.
We cannot agree with the claimant’s contention that the decedent’s mother and father were dependent distributees as contemplated by Code 55-7-6. There can be no doubt of the concern of the decedent’s parents for their son during his lifetime, nor of their bereavement at his death, but upon review of the evidence the Court is constrained to the opinion that in this case the son was the dependent and not the parents.
Accordingly, the Court is of opinion to and does hereby award the claimant, Ronald E. House, Administrator of the Estate of Edward P. House, deceased, the sum of $10,000.00, together with the additional sum of $2,000.00 for funeral expenses, a total award of $12,000.00, against the respondent, Department of Mental Health.
Award of $12,000.00.